ALICIA DANIELLE MOSTELLER, PLAINTIFF V. DUKE ENERGY CORPORATION, A
NORTH CAROLINA CORPORATION; DUKE ENERGY CAROLINAS, LLC, A NORTH
CAROLINA LIMITED LIABILITY COMPANY; AND WILLIAM RAY WALKER, DEFENDANTS

No. COA09-277

(Filed 7 September 2010)

**1. Appeal and Error— statement of facts—rules violations—
not a substantial failure**

The merits of plaintiff's appeal were considered despite
appellate rules violations concerning the statement of facts
where the violations did not impair the task of review and did not
rise to the level of a gross violation.

**2. Negligence— highway utility pole—placement not negli-
gence per se**

The trial court did not err by granting defendant's
Rule 12(b)(6) motion to dismiss a claim for negligence *per se*
in which plaintiff sought damages for injuries suffered when the
car in which she was a passenger went off a road and struck a
Duke Energy utility pole. The North Carolina Department of
Transportation (NCDOT) has the duty and responsibility to
consider all of the relevant factors at each location and to establish
where utility structures should be located. Without an allegation that
NCDOT had determined that the utility pole was in an unapproved
location, plaintiff did not adequately plead that her injuries were
proximately caused by defendant's negligence *per se*.

1

### 3. Negligence— placement of utility pole—not ordinary negligence

The trial court did not err by granting defendant's Rule 12(b)(6) motion to dismiss plaintiff's ordinary negligence claim for injuries suffered when the car in which she was riding went off the road and struck a Duke Energy utility pole. The maintenance of a utility pole does not constitute negligence unless the pole is a hazard to those using the highway in a proper manner. Here, the negligence of the driver in leaving the roadway was an intervening proximate cause.

Appeal by plaintiff from order entered 4 December 2008 by Judge Nathaniel J. Poovey in Superior Court, Gaston County. Heard in the Court of Appeals 30 September 2009.

*Brown, Moore & Associates, PLLC, by Jon R. Moore, for plaintiff-appellant.*

*Parker Poe Adams & Bernstein LLP, by John W. Francisco, for defendant-appellee Duke Energy Carolinas, LLC.*

STROUD, Judge.

Alicia Danielle Mosteller ("plaintiff") was seriously injured when the car in which she was a passenger ran off of the roadway to avoid an oncoming vehicle and hit a utility pole located within the right of way. She filed a complaint alleging negligence against both defendant William Ray Walker, the driver, and defendant Duke Energy and negligence *per se* against defendant Duke Energy. The trial court dismissed her complaint with prejudice pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted. The issue on appeal is whether plaintiff's complaint sufficiently pled a claim for negligence or negligence *per se* as to defendant Duke Energy regarding the location and maintenance of the utility pole within the highway right of way. Even if the location of the utility pole was in violation of safety regulations administered by NC DOT, plaintiff has not alleged that NC DOT ever made any determination as to the proper location for the utility pole under the applicable regulations, so plaintiff's negligence *per se* claim fails. Because the negligence of defendant Walker was the intervening proximate cause of plaintiff's injuries, plaintiff's claims of ordinary negligence against Defendant Duke Energy also fail, so we affirm the trial court's dismissal of plaintiff's complaint.

## I. Factual Background

Plaintiff's complaint, which must be "taken as true" on a motion to dismiss for failure to state a claim, *Embree Constr. Group, Inc. v. Rafcor, Inc.*, 330 N.C. 487, 490, 411 S.E.2d 916, 919-20 (1992), alleged that at approximately 7:07 p.m. on 13 February 2005, plaintiff was riding as a passenger in a vehicle operated by defendant William Ray Walker ("defendant Walker[1]") traveling southbound on Belmont-Mount Holly Road, between Interstate 85 and Woodlawn Road, in Belmont, North Carolina. Defendant Walker overreacted to an oncoming vehicle which came into his lane of travel, and he drove the vehicle off the right side of the road in a left curve, striking a utility pole ("the subject utility pole") located in the right-of-way, approximately twelve-and-a-half feet off the right side of the paved roadway. Among other injuries, plaintiff sustained a fracture of her cervical spine resulting in quadriplegia.

Defendant Duke Energy Corporation and its subsidiary Duke Energy Carolinas, LLC ("defendant Duke Energy[2]") owned, installed, and maintained the subject utility pole which defendant Walker's vehicle hit. Other vehicles had also hit the subject utility poles or its predecessor poles, including guide wires, during the eight years prior to 13 February 2005. Plaintiff's complaint incorporates accident reports from three prior automobile accidents involving the subject utility pole or predecessor poles, in 1997, 2001, and 2003. The subject utility pole was a replacement utility pole installed at the same location as the original pole within the same utility line running on the western side of Belmont-Mount Holly Road.

Plaintiff's complaint incorporated portions of various publications which address design standards for roadways, particularly as to the placement of utility structures within the right of way. For example, "A Guide for Accommodating Utilities on Highway Rights-of-Way," published in 1970 by the American Association of State Highway Officials ("AASHO") states that:

> On and along conventional highways in rural areas poles and related facilities should be located at or as near as practical to the right-of-way line. As a minimum, the poles should be located out-

---

1. Defendant Walker is not a party to this appeal, as plaintiff executed a "Covenant Not to Enforce Judgment" against defendant Walker on or about 27 April 2007, and defendant Walker did not file a brief in this appeal.

2. As defendants' brief refers to Duke Energy Carolinas LLC as successor-in-interest to Duke Energy Corporation and one brief was submitted on behalf of both entities, we will refer to both corporations collectively as "defendant Duke Energy."

side the clear roadside area for the highway section involved. There is no single minimum dimension for the width of a clear roadside area but, where there is sufficient border space, 30 feet is commonly used as a design safety guide.

Language similar to the above guideline as recommended by AASHO in 1970 was used in "Policies and Procedures for Accommodating Utilities on Highway Rights of Way[,]" adopted by the North Carolina Department of Transportation ("NC DOT") Division of Highways in 1975 ("the 1975 NC DOT manual"). The 1975 NC DOT manual states that, "Poles and related facilities on and along conventional highways in rural areas shall be located at or as near as practical to the right-of-way line."

Also incorporated into plaintiff's complaint is the affidavit of Gary Spangler, NC DOT District Engineer for the district which includes Gaston County, North Carolina. Mr. Spangler's affidavit states in pertinent part:

3. Since the 1975 publication of the Department of Transportation's "Policies and Procedures for Accommodating Utilities on Highway Rights of Way," utility companies are required to obtain written permission of the Department of Transportation before placing a utility in the right-of-way of any road on the North Carolina State System. Utility companies typically seek this written permission by applying for an encroachment on a standardized form known as an Encroachment Agreement . . . . Upon approval of the encroachment by the Department of Transportation, a copy of the Encroachment Agreement is maintained in the appropriate District office and Division office for the particular location where a utility company seeks to install a utility structure.

4. In the event a formal Encroachment Agreement is not utilized by the utility company and the Department of Transportation, the utility company must still obtain written permission to place a utility structure within the right-of-way of any road on the North Carolina State System. This is required pursuant to the Department of Transportation's "Policies and Procedures for Accommodating Utilities on Highway Rights of Way." . . . Copies of this written permission would be retained in the appropriate District office and Division office of the Department of Transportation for the particular location where a utility company seeks to install a utility structure.

**MOSTELLER v. DUKE ENERGY CORP.**

[207 N.C. App. 1 (2010)]

5. If a utility line is upgraded, it is not necessary for the utility company to file an Encroachment Agreement. Nevertheless, the Department of Transportation's "Policies and Procedures for Accommodating Utilities on Highway Rights of Way" still requires that written permission be obtained by the Department of Transportation for work done on a utility structure within the right-of-way of any road on the North Carolina State System. This documentation would be retained in the appropriate District office and Division office of the Department of Transportation for the particular location where a utility company seeks to upgrade or perform work on a utility structure.

6. Belmont-Mt. Holly Road in Gaston County, North Carolina, also know as SR-2093, is a roadway on the North Carolina State System . . . .

7. Upon a diligent and thorough search of records in the District office and Division office, there is no Encroachment Agreement, other application for encroachment, or documentation on file in the District office or Division office of the Department of Transportation that relates to the placement of utilities in the right-of-way alongside SR-2093 between Interstate 85 and Woodlawn Road in Gaston County, North Carolina. Similarly, upon a diligent and thorough search of records in the District office and Division office there is no documentation that can be found indicating permission given by the Department of Transportation for work to be done, including upgrading, on a utility line owned or operated by [defendant Duke Energy] in the right-of-way alongside SR-2093 between Interstate 85 and Woodlawn Road in Gaston County, North Carolina.

8. The right-of-way encompassing SR-2093 between Interstate 85 and Woodlawn Road is one hundred feet (100') extending for fifty feet (50') on either side of the centerline of SR-2093. There is a utility line running alongside the western edge of SR-2093 between Interstate 85 and Woodlawn Road in Gaston County, which is located within the right-of- way.

Mr. Spangler's affidavit goes on to state that Belmont-Mount Holly Road (SR-2093) in its current configuration was constructed pursuant to design drawing plans dated 2 May 1975 and the road was completed prior to 29 December 1977. The design drawing plans did not indicate the existence of a utility pole in the right-of-way along the

western edge of Belmont-Mount Holly Road in the vicinity of the subject utility pole.

Plaintiff's complaint also incorporated the affidavit of J. O'Hara Parker, Assistant State Utility Agent for the NC DOT, which states in pertinent part:

6. Upon a diligent and thorough search by myself and a member of the Right-of-Way Department, there is no Encroachment Agreement or other application for encroachment on file in the Right-of-Way office at the [NC DOT] that relates to the placement of utilities by [defendant Duke Energy] in the right-of-way along-side SR-2093 between Interstate 85 and Woodlawn Road in Gaston County, North Carolina.

Plaintiff's complaint also incorporated the affidavit of Aydren Flowers, a former State Utility Agent for the NC DOT, which states in pertinent part:

2. One of the responsibilities of the State Utility Agent is to coordinate the placement of roadside utility structures–such as utility poles—which are to be located inside highway rights-of-way in a manner that accounts for the safety of the traveling public and the protection of the integrity of the roadway facility. In this respect, the State Utility Agent works with utility companies to effectuate, as far as practical, the following "general consideration" as stated in the Department of Transportation's 1975 publication entitled "Policies and Procedures for Accommodating Utilities on Highway Rights of Way": 5 . . . . The location of the above ground utility facilities should be consistent with clear recovery area for the type of highway . . . .

3. The Department of Transportation's 1975 publication entitled "Policies and Procedures for Accommodating Utilities on Highway Rights of Way" was made available to utility companies, such as Duke Energy Carolinas, LLC, (and its predecessors) which placed utility structures within rights-of-way on roadways which were part of North Carolina Department of Transportation's roadway system. It was expected that these utility companies would adhere as far as practical to the policies and procedures set forth in this publication.

4. In furtherance of the "general consideration" referenced in paragraph 2, above, one of the policies stated in the 1975 publication was that groundmounted utility facilities, such as utility

poles, placed along a roadside "should be placed as far as practical from the traveled way and beyond the clear recovery area." . . . . With respect to conventional highways in rural areas, the policy was that "poles and related facilities . . . shall be located at or as near as practical to the right-of-way line. The poles should be located outside the clear recovery area for the highway sections involved . . . ."

5. As stated in the 1975 publication, utility companies performing work within a State right-of-way, such as installation of utility poles, are required to obtain an Encroachment Agreement. See Exhibit 4 ("Prior to beginning work within State right-of-way, the utility owner shall obtain an Encroachment Agreement."). The purpose of such an Encroachment Agreement is for the Department of Transportation to approve the placement of a utility within a State right-of-way. This approval would be based upon considerations contained in the 1975 Department of Transportation publication entitled "Policies and Procedures for Accommodating Utilities on Highway Rights of Way."

Based upon the various exhibits and affidavits which were incorporated into the complaint, only a few of which are discussed above, plaintiff alleged numerous negligent acts or omissions by defendant Duke Energy, including that defendant Duke Energy

e. Failed to install and/or replace the utility line which included the subject pole, or parts of such utility line, including the pole itself, in a location consistent with applicable North Carolina Department of Transportation regulations and/or guidelines; . . . .

k. Failed to secure the proper authorizations required by the North Carolina Department of Transportation for installation and/or modifications of the subject utility pole and/or the utility line of which the subject utility pole is a component[.]

On 25 September 2008, plaintiff filed a complaint against defendant Duke Energy and defendant Walker in Superior Court, Gaston County. On or about 23 October 2008, defendant Duke Energy filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. By order issued on 4 December 2008, the trial court granted defendant's motion, dismissing plaintiff's suit as to defendant Duke Energy. On 19 December 2008, plaintiff gave notice of appeal. On 22 June 2009, defendant Duke Energy filed a motion with this Court seeking dismissal of plaintiff's appeal and sanctions including

attorney's fees, striking portions of plaintiff's brief, and any other sanction the Court deemed proper.

## II. Motion for Sanctions

[1] We first address defendant Duke Energy's motion for dismissal of plaintiff's appeal and for sanctions against plaintiff. Defendant Duke Energy argues that portions of plaintiff's brief include "extraneous and prejudicial statements" in the "Statement of Facts" section, which are not found in the record on appeal in violation of Rule 28(b)(5) of the North Carolina Rules of Appellate Procedure. We agree with defendant that portions of plaintiff's statement of the facts in her brief violate N.C.R. App. P. 28(b)(5), in that it includes facts without supporting references to pages in the record on appeal or exhibits. However, "only in the most egregious instances of nonjurisdictional default will dismissal of the appeal be appropriate." *Dogwood Dev. & Mgmt. Co., LLC v. White Oak Transp. Co.*, 362 N.C. 191, 200, 657 S.E.2d 361, 366 (2008). "[T]he appellate court may not consider sanctions of any sort when a party's noncompliance with nonjurisdictional requirements of the rules does not rise to the level of a 'substantial failure' or 'gross violation'[,]" which is established if the violations would "impair[] the court's task of review" or "frustrate the adversarial process[.]" *Id.* at 199-200, 657 S.E.2d at 366-67. A review of plaintiff's brief shows that these violations did not occur throughout plaintiff's statement of the facts and do not "impair[] the court's task of review" or "frustrate the adversarial process[.]" *See Id.* Therefore, as plaintiff's violations of N.C.R. App. P. 28(b)(5) do not rise to the level of a "substantial failure" or "gross violation" of the rules and the "[r]ules of practice and procedure are devised to promote the ends of justice, not to defeat them[,]" we will review the merits of plaintiff's appeal. *Id.* at 194, 657 S.E.2d at 363. However, we do admonish plaintiff's counsel to include appropriate references to the record or exhibits in accordance with N.C.R. App. P. 28(b)(5) in the future.

## III. Rule 12(b)(6) Dismissal

[2] Plaintiff raises as her only assignment of error the issue of whether

> the trial court err[ed] by failing to recognize that the Legislature has superseded <u>Wood v. Carolina Telephone & Telegraph</u> (228 N.C. 605, 46 S.E.2d 717 (1948)) as controlling legal authority through its grant of power to the N.C. Department of Transportation pursuant to N.C.G.S § 136-18(10) to regulate the

installation and maintenance of utility poles alongside roadways, where such regulations establish a standard of care designed to protect the traveling public[.]

Defendant Duke Energy argues that the allegations in plaintiff's complaint, "taken as true, attempt to allege a negligence / negligence *per se* claim against Duke Energy that has specifically and consistently been adjudged defective and rejected as a matter of law by both this Court and the North Carolina Supreme Court in numerous cases over the last sixty (60) years." Therefore, "[t]his court is bound by that controlling legal precedent and should dismiss [plaintiff's] action . . . with prejudice . . . ."

A. Standard of Review

This case is before the Court on an appeal of an order dismissing plaintiff's complaint pursuant to N.C. Gen. Stat. § 1A-1, Rule 12(b)(6).

On a motion to dismiss pursuant to Rule12(b)(6) of the North Carolina Rules of Civil Procedure, the standard of review is whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory. The complaint must be liberally construed, and the court should not dismiss the complaint unless it appears beyond a doubt that the plaintiff could not prove any set of facts to support his claim which would entitle him to relief.

*Nucor Corp. v. Prudential Equity Group, LLC*, 189 N.C. App. 731, 735, 659 S.E.2d 483, 486 (2008) (citation and quotation marks omitted). The complaint in this case is somewhat unusual as it incorporated several affidavits, accident reports, and other information. Because of this additional information beyond the usual allegations of a complaint, especially the affidavits, our decision in this case may appear much like a ruling on a motion for summary judgment, but it is not. Also, we note that because the matter is before us on a motion to dismiss, defendant Duke Energy has not provided any affidavits or other information opposing the complaint's allegations, as would normally occur in a summary judgment context. We must therefore consider all of the allegations of the plaintiff's complaint, including the affidavits and various attachments, as true, and we must liberally construe all of these facts as alleged by plaintiff. *See id.*

B. Negligence *Per Se*

### 1. NC DOT regulations applicable to the subject utility pole.

Plaintiff first contends that based upon applicable NC DOT regulations and the facts alleged in her complaint, she has sufficiently pled a claim for negligence *per se*. Plaintiff argues that NC DOT regulations establish the applicable standard of care, superceding *Wood v. Carolina Telephone & Telegraph Co.*, 228 N.C. 605, 46 S.E.2d 717 (1948) and other cases following *Wood* which are relied upon by defendant Duke Energy. Plaintiff argues these NC DOT regulations carry the force and effect of law and give rise to a cause of action for violation, so defendant's failure to obtain the necessary authorizations, as required by NC DOT regulations, for placement of the subject utility pole struck by defendant Walker constitutes negligence per se.

Defendant Duke Energy contends that the allegations in plaintiff's complaint "do not establish that the cited NC DOT regulations apply to control Duke Energy's conduct with respect to the installation of the overhead electrical line at issue . . . . because there is no allegation that the electrical line was installed <u>after</u> the effective dates of those regulations." Thus, defendant Duke Energy's first argument is that the regulations as alleged by plaintiff do not apply to the subject utility pole.

Plaintiff has made allegations that several different guidelines or regulations apply to the subject utility pole. The first, adopted in 1975, is the Department of Transportation's "Policies and Procedures for Accommodating Utilities on Highway Rights of Way" ("the 1975 NC DOT manual"). Plaintiff's complaint alleges that the relevant provisions of the 1975 NC DOT manual are "applicable to Belmont-Mt. Holly Road." Plaintiff also alleged that "[u]pon information and belief the utility line which contains the subject utility pole was installed subsequent to 1977." Plaintiff alleges that the subject utility pole was in violation of Chapter 19A, Section 02B.0502 of the North Carolina Administrative Code, titled "Permission Required for Encroachment," with an effective date of 3 April 1981. Defendant argues that since plaintiff has alleged that the utility line including the subject utility pole was installed "sometime" after 1977, plaintiff has failed to establish that "the cited regulations apply to or govern the installation of the electrical line at issue, including the subject utility pole, and they do not establish a standard of care, the violation of which amounts to negligence *per se*[.]" However, plaintiff has also alleged that the subject utility pole was impacted in 1997, 2001, and 2003, sustaining

MOSTELLER v. DUKE ENERGY CORP.

[207 N.C. App. 1 (2010)]

damage which required replacement of the pole. Plaintiff also alleged that "upon information and belief the subject utility pole had been installed subsequent to 1999."

On a motion to dismiss, we are required to liberally construe the allegations of the complaint and to treat them as true. *See Nucor Corp.*, 189 N.C. App. at 735, 659 S.E.2d at 486. By application of this standard, the complaint alleges that the subject utility pole was installed after 1999 and was therefore governed by all of the statutes, guidelines, and regulations alleged by plaintiff. As we must accept the allegations of the complaint as true, defendant Duke Energy's argument as to the applicable dates of the regulations fails. For purposes of the motion to dismiss, we must therefore consider all of the NC DOT guidelines and regulations alleged by plaintiff as applicable to the subject utility pole's installation and maintenance.

2. NC DOT regulations establish the duty of care.

Plaintiff argues that the NC DOT regulations and guidelines incorporated into her complaint establish defendant Duke Energy's duty of care, and violation of those regulations and guidelines is negligence *per se*. A public safety statute can impose a specific duty on a defendant for the protection of others. *Stein v. Asheville City Bd. of Educ.*, 360 N.C. 321, 326, 626 S.E.2d 263, 266 (2006). Violation of the public safety statute constitutes breach of that duty or negligence *per se*. *Id.* "The basis of the rule seems to be that the statute prescribes the standard of care, and the standard fixed by the Legislature is absolute." *Byers v. Std. Concrete Prods. Co.*, 268 N.C. 518, 521, 151 S.E.2d 38, 40 (1966) (citation omitted). However, "not every statute [or regulation] purporting to have generalized safety implications may be interpreted to automatically result in tort liability for its violation." *Williams v. City of Durham*, 123 N.C. App. 595, 598, 473 S.E.2d 665, 667 (1996) (citation and quotation marks omitted). For a safety regulation to be adopted as a standard of care, the purpose of the regulation must be at least in part:

(a) to protect a class of persons which includes the one whose interest is invaded, and

(b) to protect the particular interest which is invaded, and

(c) to protect that interest against the kind of harm which has resulted, and

(d) to protect that interest against the particular hazard from which the harm results.

*Hutchens v. Hankins*, 63 N.C. App. 1, 14, 303 S.E.2d 584, 592, *disc. review denied*, 309 N.C. 191, 305 S.E.2d 734 (1983) (citation and quotation marks omitted). An agency is prohibited from imposing criminal liability or civil penalty for violation of a safety regulation "unless a law specifically authorizes the agency to do so or a law declares that violation of the rule is a criminal offense or is grounds for a civil penalty." N.C. Gen. Stat. § 150B-19(3)(2005). Therefore, if the violation of a safety regulation is punishable as a criminal offense, the violation may establish negligence *per se* in a civil trial in certain circumstances.

Our Supreme Court most recently addressed a situation in which a plaintiff was injured by an "errant vehicle" which collided with a utility structure within highway a right-of-way in *Baldwin v. GTE S., Inc.*, 335 N.C. 544, 439 S.E.2d 108 (1994). In *Baldwin*, plaintiff was injured when a dump truck struck the telephone booth in which she was making a phone call. *Id.* at 545, 439 S.E.2d at 108. The telephone booth was located inside the public right-of-way and owned by defendant GTE South. *Id.* The Court observed that pursuant to the enabling authority of N.C. Gen. Stat. § 136-18(10), NC DOT has power

> [t]o make proper and reasonable rules, regulations and ordinances for the placing or erection of telephone, telegraph, electric and other lines, above or below ground, signboards, fences, . . . pipelines, and other similar obstructions that may, in the opinion of [NC DOT], contribute to the hazard upon any of the said highways or in any way interfere with the same, and to make reasonable rules and regulations for the proper control thereof.

*Id.* at 546, 439 S.E.2d at 109 (quoting N.C. Gen. Stat. § 136-18(10)). Also, the Court noted that "[a]ny violation of such rules and regulations . . . shall constitute a misdemeanor." *Id.* The Court also stated that pursuant to N.C. Gen. Stat. § 136-18(10), NC DOT enacted a regulation prohibiting the placement of telephone booths within rights-of-way, except in rest areas or truck weigh stations, in NC DOT's manual titled, "Policies and Procedures for Accommodating Utilities on Highway Rights of Way." *Id.* The Court found that "[d]efendant, which was legally obligated to follow the regulation, violated this prohibition when it installed the . . . telephone booth within the public right-of-way." *Id.* The Court then held that

> [w]hen the violation of an administrative regulation enacted for safety purposes is criminal [such as N.C. Gen. Stat. § 136-18(10)], that violation is negligence *per se* in a civil trial unless otherwise provided. A safety statute or a safety regulation having the force and

effect of a statute creates a specific duty for the protection of others. A member of the class intended to be protected by a statute or regulation who suffers harm proximately caused by its violation has a claim against the violator. To determine whether a plaintiff is a member of the class protected by the regulation, we must examine [the regulation's] purpose . . . .

*Id.* at 546-47, 439 S.E.2d at 109 (citations omitted). The Court found that since "the purpose of this regulation was to protect the safety of the motorist who might leave the road and strike the booth while simultaneously protecting the pedestrian who might be using the booth" and, as plaintiff was a pedestrian using the booth, she was a member of the class the regulation was intended to protect. *Id.* at 548, 439 S.E.2d at 110.

*Baldwin* establishes that NC DOT regulations regarding the placement of telephone booths in the right-of-way in the 1975 NC DOT manual, adopted pursuant to N.C. Gen. Stat. § 136-18, establish a standard of care for a defendant utility company. *See id.* Similarly, plaintiff here contends that NC DOT regulations in the same 1975 NC DOT manual, along with additional NC DOT regulations and guidelines regarding placement of utility poles in the rights-of-way of roads and highways within North Carolina, also establish a standard of care for defendant Duke Energy. The 1975 NC DOT manual provides that

Longitudinal installations should be located on uniform alignment, preferably near the right-of-way lines as determined satisfactory by the Manager of Right-of-Way or Division Engineer so as to provide a safe environment for traffic operation . . . . The location of the above ground utility facilities [such as utility poles] should be consistent with clear recovery area for the type of highway involved, so as to provide drivers of errant vehicles which leave the traveled portion of the roadway a reasonable opportunity to stop safely or otherwise regain control of the vehicle . . . . Poles and related facilities on and along conventional highways in rural areas *shall be located at or as near as practical to the right-of-way line*. The poles should be located outside the clear recovery area for the highway sections involved . . . .

The 1975 NC DOT manual defines "Clear Recovery Area" as

[t]hat portion of the roadside, adjacent to the traveled way and shoulders, having slopes safely traversable by vehicles and which has been designated as the area to be kept as free as practical

from those above-ground physical obstructions that would be a hazard. The width of an area varies according to the type of highway involved and may vary on different sections of the same type of highway.

The 1975 NC DOT manual goes on to state regarding placement of power and communication lines that

[a] critical requirement for locating poles . . . along the roadside is the width of the border area, that is, the space between the back of [the] ditch or curb line and the right-of-way line, and its availability and suitability for accommodating such facilities. The safety, maintenance efficiency, and appearance of highways are enhanced by keeping this space as free as practical from obstacles above the ground. Where ground-mounted utility facilities are to occupy this space, they should be placed as far as practical from the traveled way and beyond the clear recovery area . . . .

Plaintiff also contends that pursuant to N.C. Gen. Stat. § 136-18(10), NC DOT in 1978 promulgated Chapter 19A, Section 02E.0420 of the North Carolina Administrative Code, titled "Construction Within Right-of-Way," which states

[i]t shall be unlawful for any person or firm to construct, place or erect any power, telephone or other poles . . . in, over, or upon any road, highway or right of way of the State Highway System without the written permission of the State Highway Administrator or his authorized agent.

19A N.C. Admin. Code 02E.0420 (2005) (effective 1 July 1978). Also, plaintiff contends that pursuant to N.C. Gen. Stat. § 136-18(10) (2005), NC DOT promulgated Chapter 19A, Section 02B.0502 of the North Carolina Administrative Code, titled "Permission Required for Encroachment", which states

(a) No utility shall cross or otherwise occupy rights-of-way of any road on the State Highway System without written permission from the Department of Transportation.

(b) No utility which has been placed on the right-of-way of any road on the State Highway System shall be changed or removed without written permission from the Department of Transportation.

19A N.C. Admin. Code 02B.0502 (2005)(effective 3 April 1981).

**MOSTELLER v. DUKE ENERGY CORP.**

[207 N.C. App. 1 (2010)]

Based upon *Baldwin* and *Hutchens*, we must first examine the purpose of the regulations to determine if these NC DOT regulations establish a standard of care applicable to defendant Duke Energy. *See Hutchens*, 63 N.C. App. at 14, 303 S.E.2d at 592. The 1975 NC DOT manual states that the reason for the regulations relevant to plaintiff's claim is "to provide a safe environment for traffic operation" by limiting or prohibiting obstacles in the right-of-way and providing for a "clear recovery area" for the type of highway involved, so that "drivers of errant vehicles which leave the traveled portion of the roadway [may have] a reasonable opportunity to stop safely or otherwise regain control of the vehicle." Although the word "purpose" is not used, the purpose of the regulation is clearly "to provide a safe environment for traffic operation" which includes protection of "drivers of errant vehicles which leave the traveled portion of the roadway." Even though 19A N.C. Admin. Code 02E.0420 and 19A N.C. Admin. Code 02B.0502 do not state an express purpose, our Courts have recognized implied purposes in determining whether a plaintiff was a member of the class the regulation was intended to protect for negligence *per se. See Baldwin*, 335 N.C. at 547-48, 439 S.E.2d at 110; *Byers*, 268 N.C. at 521-22, 151 S.E.2d at 40-41. When read in conjunction with the 1975 NC DOT manual, 19A N.C. Admin. Code 02E.0420 and 19A N.C. Admin. Code 02B.0502 furthers the 1975 NC DOT manual's purpose of providing a safe environment for motorists by requiring written permission from NC DOT before placement of or modification to those utilities in the right-of-way so NC DOT can evaluate the effect of that proposed utility structure upon the safety of the traveling public. Therefore, the implied purpose of these NC DOT regulations is also to provide a safer environment for motorists, including "errant vehicles" which leave the paved roadway.

As we have determined that the purpose of the NC DOT regulations is to provide a safer environment for motorists, including those in "errant vehicles" which leave the paved roadway, under *Hutchens* we must next consider if the regulations are intended "to protect a class of persons which includes the" plaintiff.[3] 63 N.C. App. at 14, 303

3. We note that the *Baldwin* court specifically rejected the holding of the Court of Appeals that the plaintiff in that case was not a member of a protected class under the *Hutchens* analysis. 335 N.C. at 548, 439 S.E.2d at 110. The Court of Appeals held that "the DOT prohibition against telephone booths in or upon highway rights-of-way does not include pedestrians within the class of protected persons. While the DOT's regulation may have safety implications, it does not provide a basis for negligence claims by this plaintiff." *Baldwin v. GTE S.*, 110 N.C. App. 54, 59, 428 S.E.2d 857, 860 (1993) (citation omitted).

S.E.2d at 592. The regulations state that their interest is for motorist safety on the highways and plaintiff's specific interest which was invaded was her safety as an passenger in a automobile traveling on the public highways. The regulations are intended to protect "errant vehicles" "which leave the traveled portion of the roadway" from colliding with utility structures located in the right-of-way to an extent which is to be determined by the NC DOT in accordance with the requirements of a "clear recovery area[;]" plaintiff was a passenger in an "errant vehicle" which left "the traveled portion of the roadway" and collided with a utility structure, in this case the subject utility pole, located in the public right-of-way. Plaintiff is clearly within the class of persons which the regulations are intended to protect.

Likewise, the regulations were intended "to protect the particular interest which is invaded" and "to protect that interest against the kind of harm which has resulted." *See Hutchens*, 63 N.C. App. at 14, 303 S.E.2d at 592. The regulations protect plaintiff's specific interest as they promote highway safety by requiring a "clear recovery zone" in the public right-of-way for motorists to stop or recover control if they leave the roadway, by NC DOT regulation of the placement of utility structures in the public right-of-way. Plaintiff has alleged that she was injured because the car in which she was a passenger hit the subject utility pole, for which defendant Duke Energy had not obtained NC DOT approval in accordance with the applicable safety regulations. In addition, the regulations are specifically intended to "to protect [plaintiff's] interest against the particular hazard from which the harm results." *Hutchens*, 63 N.C. App. at 14, 303 S.E.2d at 592. Also, a violation of these safety regulations enacted pursuant to N.C. Gen. Stat. § 136-18(10) for safety purposes is a Class 1 misdemeanor. *See* N.C. Gen. Stat. § 150B-19(3). Given that the purposes of these regulations satisfy the enumerated requirements of *Hutchens*, 63 N.C. App. at 14, 303 S.E.2d at 592, plaintiff has sufficiently alleged these regulations as the standard of care for defendant Duke Energy. Accordingly, violation of these regulations could be the basis for a claim of negligence *per se. See Baldwin*, 335 N.C. at 546, 439 S.E.2d at 109-10.

3. <u>Breach of defendant's duty of care.</u>

We have established that the NC DOT regulations are applicable to the subject utility pole and that a violation of these regulations may be the basis of a claim of negligence *per se*. Plaintiff has alleged that defendant Duke Energy failed to obtain from NC DOT a permit or encroachment agreement as required by law and that the pole was

located and maintained in violation of the applicable regulations. Accepting the allegations of plaintiff's complaint as true, *Nucor Corp.*, 189 N.C. App. at 735, 659 S.E.2d at 486, defendant Duke Energy has breached its duty to comply with the regulations. Therefore, plaintiff has pled a breach of defendant Duke Energy's duty of care.

4. Proximate causation.

A claim of negligence *per se* or ordinary negligence must also demonstrate that the statutory violation was "a proximate cause of [plaintiff's] injury[.]" *Hart v. Ivey*, 332 N.C. 299, 303, 420 S.E.2d 174, 177-78 (1992) (citation omitted). *See Sellers v. CSX Transp., Inc.*, 102 N.C. App. 563, 566, 402 S.E.2d 872, 874 (1999) ("Violation of a duty imposed by a safety statute is negligence per se and conclusive evidence of both the presence of a duty and a breach of it. However, recovery still requires proof of proximate cause." (citation omitted)).

> It is well settled in this jurisdiction that the violation of a town or city ordinance, or State statute, is negligence *per se*, but the violation must be the proximate cause of the injury. Ordinarily this is a question for the jury, if there is any evidence, but, if there is no evidence that the violation of the ordinance or statute is the proximate cause of the injury, this is for the court to determine.

*Hendrix v. Southern R. Co.*, 198 N.C. 142, 144, 150 S.E. 873, 873 (1930).

Plaintiff argues that the trial court incorrectly relied upon *Wood v. Carolina Telephone & Telegraph*, 228 N.C. 605, 46 S.E.2d 717 (1948) in holding that defendant's placement of the subject utility pole was not a proximate cause of plaintiff's injuries because plaintiff's injuries were not a foreseeable consequence of defendant's actions. Plaintiff further contends that *Wood* and cases following *Wood* concerning the foreseeability that a vehicle may leave the traveled roadway have been superseded by the General Assembly's subsequent enactment of specific regulations governing the installation and maintenance of utility poles, with a purpose of protecting "errant vehicles." Defendant Duke Energy argues that its alleged negligence *per se* in placement of the subject utility pole, even if "taken as true, is not and cannot be the proximate cause of [plaintiff's] alleged injuries" because established case law holds that utility companies are not required to foresee the negligent act of a motorist leaving the intended path of travel and coming into contact with a utility pole, and the negligent acts of the defendant Walker, the driver, are an intervening cause of plaintiff's injuries.

MOSTELLER v. DUKE ENERGY CORP.

[207 N.C. App. 1 (2010)]

Defining the limits of proximate causation is frequently a challenging task for our courts, especially in cases which involve two acts of negligence which may have led to the plaintiff's injuries.

> Proximate cause has been defined as a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and *without which the injuries would not have occurred*, and one from which a person of ordinary prudence could have reasonably foreseen that such a result, or consequences of a generally injurious nature, was probable under all the facts as they existed.

*Lynn v. Overlook Dev.*, 328 N.C. 689, 696, 403 S.E.2d 469, 473 (1991) (citation and quotation marks omitted) (emphasis in original). Our Supreme Court has also noted that:

> [a]n efficient intervening cause is a new proximate cause which breaks the connection with the original cause and becomes itself solely responsible for the result in question. It must be an independent force, entirely superseding the original action and rendering its effect in the causation remote. It is immaterial how many new elements or forces have been introduced, if the original cause remains active, the liability for its result is not shifted . . . .

*Hairston v. Alexander Tank & Equipment Co.*, 310 N.C. 227, 236, 311 S.E.2d 559, 566-67 (1984) (citation and quotation marks omitted). We must apply these general statements of the law of proximate causation in the context of the facts alleged by plaintiff and the cases preceding this one which have also addressed these issues in similar factual situations. Our Supreme Court has stated that:

> Definitions and general statements made with reference to specific situations are of little help in those cases in which the defendant's negligence is followed, not by reasonably foreseeable consequences but by events which, prima facie, he could not have anticipated. Prosser, in his Law of Torts § 50 (3d Ed. 1964) at p. 288, says: " 'Proximate cause' cannot be reduced to absolute rules. No better statement ever has been made concerning the problem than that of Street: 'It is always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy and precedent. . . .' " The policy argument over whether the loss should be borne by an innocent plaintiff or a defendant whose negligence caused harmful events not reasonably foreseeable will continue. However, since it is "inconceivable that any defendant should be

held liable to infinity for all the consequences which flow from his act," some boundary must be set. *Id.* at p. 303. The concept of the foreseeable risk, especially in cases involving an intervening cause, seems to offer the most elastic and practical solution. *See* Prosser at pp. 306, 310-11. *See also* Morris, 34 Minn. L. Rev. 185 (1950).

*Sutton v. Duke*, 277 N.C. 94, 108, 176 S.E.2d 161, 169 (1970).

We therefore turn first to examine the precedents set by our courts. The North Carolina Supreme Court's prior cases addressing the proximate causation and foreseeability of injury in cases dealing with errant vehicles which collide with a structure in the right-of-way may appear to be inconsistent. On one hand, defendant Duke Energy argues correctly that since *Wood*, as a general rule, a plaintiff may not recover from a utility company which maintains a structure in the right-of-way for injuries sustained from collision with the structure by a motor vehicle which has run off of the roadway. *See Wood*, 228 N.C. at 607-08, 46 S.E.2d at 719. On the other hand, plaintiff argues correctly that our Supreme Court in *Baldwin* affirmed the plaintiff's recovery in exactly this situation, and, even though proximate causation was not directly addressed, *Baldwin* would suggest that defendant Duke Energy should have reasonably foreseen the risk of injury caused by the subject utility pole based upon the NC DOT regulations which address this very risk. *See Baldwin*, 335 N.C. at 546, 439 S.E.2d at 109.

The 1975 NC DOT manual "Policies and Procedures for Accommodating Utilities on Highway Rights of Way" states that "[t]he location of the above ground utility facilities should be consistent with clear recovery area for the type of highway involved, *so as to provide drivers of errant vehicles which leave the traveled portion of the roadway reasonable opportunity to stop safely or otherwise regain control of the vehicle.*" (emphasis added). Plaintiff's complaint also includes the affidavit of Aydren Flowers, the former State Utility Agent for the NC DOT, which states in pertinent part: "[U]tility poles . . . are to be located inside highway rights-of-way in a manner that accounts for the safety of the traveling public and the protection of the integrity of the roadway facility." Ms. Flowers also states that the State Utility Agent works with utility companies to effectuate, as far as practical, the following "general consideration" as stated in the 1975 NC DOT manual "Policies and Procedures for Accommodating Utilities on Highway Rights of Way[:]"

The location of the above ground utility facilities should be consistent with clear recovery area for the type of highway involved,

so as to provide drivers of errant vehicles which leave the traveled portion of the roadway a reasonable opportunity to stop safely or otherwise regain control of the vehicle. . . .

As noted above, it is clear from the language of the 1975 NC DOT manual that one of the primary purposes of the regulations is to account for drivers errantly leaving the traveled portion of the roadway and to provide for a safe area for those drivers to stop or recover safely. Plaintiff alleged that defendant Duke Energy knew or should have known about these regulations, although regardless of whether or not defendant Duke Energy knew about the regulations, it was bound by them. Plaintiff also included with her complaint accident reports showing that between 1997 and 2003 at least three motorists ran off the traveled roadway and hit the subject utility pole or predecessor poles in the same location. Therefore, plaintiff argues that in the exercise of reasonable care defendant Duke Energy should have foreseen the risk of injury to a motorist because of its placement of the subject utility pole in violation of NC DOT regulations.

*Baldwin* is the only North Carolina case cited by the parties or that we have been able to locate in our own research which finds the owner of a utility structure located in a highway right-of-way liable for injury to a person injured because a motor vehicle left the roadway and hit the utility structure. *See Baldwin,* 335 N.C. at 547-48, 439 S.E.2d at 109-10. All other cases addressing this factual situation have held that the owner of the utility structure is not liable, either based upon a lack of proximate causation or by intervening proximate cause. In addition to citing *Wood,* defendant Duke Energy also cites to *Alford v. Washington,* 238 N.C. 694, 78 S.E.2d 915 (1953) and *Shapiro v. Toyota Motor Co.,* 38 N.C. App. 658, 248 S.E.2d 868 (1978), in support of its argument that utility companies are not required to foresee or protect against collisions between negligently operated motor vehicles and utility poles located off the roadway. Defendant concludes that as plaintiff alleges that the utility pole at issue was located 12.5 feet off the roadway and would not have caused plaintiff's injuries had defendant Walker had stayed within the intended path of travel for the road, defendant's alleged negligent acts of improperly locating, installing, and maintaining the pole, even if true, are not and cannot be a proximate cause of plaintiff's damages as a matter of law. Essentially, defendant Duke Energy argues that defendant Walker's negligence in running off of the roadway was the intervening proximate cause of plaintiff's injuries.

In *Wood v. Carolina Telephone & Telegraph Co.,* 228 N.C. 605, 46 S.E.2d 717 (1948), the plaintiff's car blew out its left rear tire causing

the car to skid to the left. The plaintiff then inadvertently placed his right foot on the accelerator instead of the brake, causing the car to increase in speed and skid farther across the road to the left. *Id.* at 606, 46 S.E.2d at 718. The momentum of the car pulled the plaintiff's left arm out of the open driver's side window and it hit a telephone pole, located six inches outside the traveled portion of the street, causing injuries to the plaintiff's arm. *Id.* at 606, 46 S.E.2d at 717-18. The defendant maintained the telephone pole as part of its communications system. *Id.* at 606, 46 S.E.2d at 717. The plaintiff alleged "that the manner of maintenance of said pole constituted a hazard and menace to persons traveling on the street and was in violation of a pleaded town ordinance and constitutes negligence which proximately caused his injury." *Id.* at 606, 46 S.E.2d at 718. The *Wood* Court recognized the allegation that the location of pole which injured the plaintiff's arm may have been in violation of the town ordinance and thereby negligent as follows:

it is debatable whether the maintenance of defendant's telephone pole at the point alleged is in violation of the pleaded town ordinance. It is not alleged that no license has issued as required by the ordinance. Furthermore, it may be that the ordinance has been superseded and rendered void by subsequent legislative acts. G. S. 105-120 (5); G. S. 136-18 (j)[.]

*Id.* at 607, 46 S.E.2d at 718. However, the Court declined to rule on this basis, stating, "This we need not now decide, for, even if we concede negligence on the part of the defendant as alleged by plaintiff, there is no allegation in the complaint which reasonably imports injury to plaintiff as a proximate result thereof." *Id.* at 607, 46 S.E.2d at 719. Instead, the Court affirmed the trial court's dismissal, holding that the defendant's actions were not the proximate cause of the plaintiff's injuries because the "defendant, in the exercise of due care and foresight, could [not] have foreseen or anticipated that a motorist traveling along the street would, voluntarily or involuntarily, place his arm out of the window of his vehicle to such an extent that it would come in violent contact [with the pole]." *Id.* at 608, 46 S.E.2d at 719. The Court further held that the defendant did not have a duty to foresee "the unusual, extraordinary, or exceptional[;]" "[t]he occurrence detailed by plaintiff in his complaint was beyond the realm of probability[;]" and the plaintiff's action whether inadvertence, mishap, or act of negligence "was the intervening proximate cause of his injury." *Id.* (citation omitted). The Court's decision relied entirely upon foreseeability considerations and "intervening proximate cause" of the injury based on the plaintiff's

actions. *Id.* at 607-08, 46 S.E.2d at 719. The Court also did not deem it necessary to determine that the plaintiff was himself contributorily negligent in causing the accident, stating that

> It is unnecessary to undertake to label plaintiff's own conduct Whether his acceleration of the speed of the car at the time and under the attendant circumstances was a mere inadvertence, a mishap, or an act of negligence, the fact remains that such conduct on his part was the intervening proximate cause of his injury.

*Id.* at 608, 46 S.E.2d at 719 (citation omitted).

In *Shapiro,* the plaintiff was injured when the car in which he was riding as a passenger collided with a telephone pole located beside the road, on the night of 19 September 1973. 38 N.C. App. at 659, 248 S.E.2d 868-69. The plaintiff brought a claim against the defendant telephone company, which erected and maintained the telephone pole.[4] *Id.* at 659, 248 S.E.2d at 869. The plaintiff accused the defendant telephone company of "negligent placement of said telephone pole on a dangerous curve, after knowledge of numerous prior accidents involving other vehicles and other poles located in virtually the same exact location." *Id.* In response to interrogatories, the defendant telephone company "produced a Rural Electrification Administration Telephone Engineering and Construction Manual which requires a clearance of only six inches (6") between a curb and telephone pole, subject to local requirements if more stringent." *Id.* at 660, 248 S.E.2d at 869. In response to a similar interrogatory, the defendant power company produced "State Department of Transportation Policies and Procedures[,]" which provided that "[t]here is no single minimum dimension for setback of poles behind curbs; however, where there are curbed sections and no sidewalks, 6' will be used as a design safety concept guide." *Id.* The defendant telephone company "moved for summary judgment; in support it submitted the 1951 ordinance under which the town authorized erection of telephone poles and an affidavit showing that this pole was located twelve and one-half inches (12 1/2") beyond the curb[.]" *Id.* The plaintiff also filed three affidavits.

---

4. The plaintiff in *Shapiro* also brought negligence claims against Toyota Motor Co. and the Town of Matthews, but those claims were unrelated to the location and maintenance of the telephone pole. 38 N.C. App. at 659, 248 S.E.2d at 868-69. The plaintiff dismissed his claim against Duke Power Co., which maintained a light on the telephone pole, prior to the appeal. *Id.*

One was from a photographer identifying the photographs of [the road in question]. An affidavit from engineer Rolf Roley, an expert in automobile accidents, tended to show that the intersection "was inherently dangerous and extremely hazardous in that it had been constructed as an angle," that there were inadequate warnings leading up to the intersection and inadequate lane markings in the intersection, that there was no reason for placing this telephone pole at its existing location, that if Roley "were called upon to place a pole at a point most likely to be involved with vehicular problems and impacts, I would select the exact spot where this pole is placed," and that the Toyota involved in this accident would have missed nearby trees and "would have done nothing more than run into the yard . . . if the pole had not been at that location." Finally plaintiffs presented, by way of an affidavit from one of their attorneys, Department of Motor Vehicles records showing seven accidents at this intersection since 1967, four of which involved telephone poles at this same location, and a newspaper story referring to this intersection as "dead man's curve."

*Id.* at 660-61, 248 S.E.2d at 869-70. The trial court granted summary judgment for defendant. *Id.* at 661, 248 S.E.2d at 870. This Court, referencing the decision in *Wood,* held that "the maintenance of a utility pole along a public highway does not constitute an act of negligence unless the pole constitutes a hazard to motorists using the portion of the highway designated and intended for vehicular travel in a proper manner." *Id.* at 663, 248 S.E.2d at 871. Applying this rule, this Court affirmed summary judgment as the car the plaintiff was riding in

failed to negotiate the curve and crashed into the telephone pole located twelve and one-half inches (12 1/2") beyond the elevated curbing forming the southern edge of the outside eastbound lane of travel for vehicles approaching downtown Matthews from the west. Obviously, the pole would not have been struck had the Toyota been operated in a proper manner. Thus, the maintenance of the pole did not constitute an act of negligence.

*Id.* at 663-64, 248 S.E.2d at 871. Although the Court stated that "the maintenance of the pole" in its particular location "did not constitute an *act of negligence*[,]" this statement appears to conflate the concepts of negligence and proximate cause and perhaps misstates the opinion's actual holding. As *Shapiro* is based upon *Wood,* the Court might have more aptly stated its conclusion as follows: "[E]ven if we concede negligence on the part of the defendant" as to "the maintenance of the

pole[,]" "there is no allegation in the complaint which reasonably imports injury to plaintiff as a proximate result thereof[,]" because the negligence of the plaintiff's driver "was the intervening proximate cause of [the plaintiff's] injury." *Wood*, 228 N.C. at 607-08, 46 S.E.2d at 719.

In *Alford*, the plaintiff alleged that the defendant town maintained a street light in an intersection 15 feet above the surface of the road, by means of a supporting wire attached to two poles, with high voltage wires for current. 238 N.C. at 695, 78 S.E.2d at 916. These poles were located within a few inches of the curb on either side of the road. *Id.* The defendant driver, while intoxicated and speeding, failed to yield as he entered the intersection and his vehicle hit a third vehicle, causing it to knock down one or more of the supporting poles of the street light resulting in exposed electrical wires falling onto that third vehicle, charging it with electrical current. *Id.* at 697, 78 S.E.2d at 917. The plaintiff's intestate was killed by high voltage current as he sought to rescue the passengers caught in the third vehicle. *Id.* The plaintiff alleged that the poles were located negligently within a few inches of the traveled portion of the street. *Id.* at 696, 78 S.E.2d at 916. The defendant town and the defendant driver moved for dismissal on the grounds that the plaintiff pled insufficient facts to show negligence or proximate causation and contributory negligence by plaintiff. *Id.* at 697-98, 78 S.E.2d at 918. The trial court granted the defendants' motions.

*Id.* at 698, 78 S.E.2d at 918.

The Court, in affirming the trial court's order dismissing plaintiff's claim, held that "it appears upon the face of the complaint that the injury to and death of plaintiff's intestate was 'independently and proximately produced by the wrongful act, neglect, or default of an outside agency or responsible third person.' " *Id.* citation and quotation marks omitted). The trial court went on to hold that "[o]ne is not under a duty of anticipating negligence on the part of others, but in the absence of anything which gives or should give notice to the contrary, a person is entitled to assume, and to act upon the assumption that others will exercise care for their own safety." *Id.* at 700, 78 S.E.2d at 919 (citation omitted). Thus, *Wood* and the other cases relied on by defendant have held that even if the utility company was negligent in its location of the pole, the pole would have produced no damage to the plaintiff if either the plaintiff or a responsible third party had not caused a vehicle to leave the traveled roadway and hit the pole.

We are therefore left with the dilemma of reconciling *Baldwin* with *Wood* and the line of cases following *Wood*, as the *Baldwin*

Court did not overrule *Wood*. As stated above, the *Baldwin* Court held that the same 1975 NC DOT manual which applies in this case establishes a standard of care for a defendant utility company. 335 N.C. at 548, 439 S.E.2d at 110. In addition, *Baldwin* extended this duty to protect a person who was in the right-of-way, but not in the traveled roadway, who was injured by an "errant vehicle" which ran off of the roadway due to the negligent act of a third party.[5] *Id.* Based upon the NC DOT manual, which includes regulations intended to protect motorists in "errant vehicles," and *Baldwin*, we cannot say that the mere fact that a vehicle drove outside the travel lane is "beyond the realm of probability[,]" "unusual, extraordinary, or exceptional." *Wood*, 228 N.C. at 607, 46 S.E.2d at 719.

However, *Baldwin* and *Wood* and its progeny may be distinguished by the fact that the utility poles as in *Wood, Shapiro, and Alford* were *permitted within the right of way*, albeit subject to certain restrictions, while the telephone booth in *Baldwin* was in an area where it was *entirely prohibited. See Baldwin*, 335 N.C. at 546, 439 S.E.2d at 109. It is both legal and necessary for utility poles to be located within rights-of-way of roads and highways. As noted in *Wood*,

> In almost every hamlet, town and city in the State the space between the sidewalk proper and the street is used for the location and maintenance of telephone and telegraph poles, traffic signs, fire hydrants, water meters, and similar structures. It is a matter of common knowledge that this space is so used. In no sense do such structures constitute a hazard to or in any wise impede the free use of the vehicular lane of travel.

228 N.C. at 607, 46 S.E.2d at 718. (Citations omitted). The NC DOT regulations alleged by plaintiff govern the locations of utility poles but recognize that it is necessary for utility poles and other similar structures to be within the right-of-way. There is no apparent reason or necessity for a telephone booth to be located within a right-of-way of a public roadway. Although the *Baldwin* court did not explain how it distinguished the situation of a telephone booth within the right-of-way from the precedents dealing with utility poles within the right-of-way, we believe that *Baldwin* and *Wood* can be logically reconciled in this manner. In these cases, it is necessary to balance the needs of the public to affordable utility services against the need to provide those services in a reasonably safe manner. Certain utility structures are

---

5. We note that *Baldwin* does not cite, distinguish, or even mention *Wood*, despite the fact that the parties did address *Wood* in their briefs in that case.

necessary within the public rights-of-way for provision of electric, telephone, and other services, while telephone booths are a convenience which can just as easily be located on property which is not within a right-of-way.

As applied to the case before us, this distinction points out the deficiency in the plaintiff's complaint. In *Baldwin*, the plaintiff had to show only that the telephone booth was located within the right-of-way to demonstrate violation of the safety regulation. 335 N.C. at 546, 439 S.E.2d at 109. There was no place within the right-of-way in the vicinity of the accident where a telephone booth would be allowed under any circumstances; no matter where the errant driver ran off the road and hit the booth, the booth should not have been located in that spot. *See id.* Here, plaintiff does not claim that defendant violated the applicable regulations merely by placing or maintaining the subject pole in the right-of-way; the plaintiff claims that the negligence *per se* arises from defendant Duke Energy's failure to install and/or replace the subject utility pole in a location consistent with NC DOT regulations and guidelines and its failure to obtain approval from NC DOT to place the subject pole in a particular location. Unlike the determination of whether the phone booth in *Baldwin* was in violation of the safety regulation, here the applicable statute, regulations, and the 1975 NC DOT manual provide that NC DOT has the exclusive authority to determine the proper placement of a utility pole within the right-of-way.

The 1975 NC DOT manual mandates that "[p]rior to beginning work within [a] State right-of-way, the utility owner shall obtain an Encroachment Agreement." The 1975 NC DOT manual also mandates that a request for an encroachment agreement include "[t]he State standards for accommodating utilities[;]" "[a] general description of the size, type, nature, and extent of the utility facilities[;]" drawings or sketches of the existing or proposed utility facility; "[t]he extent of liability and responsibilities associated with future adjustment of the utilities to accommodate future highway improvement[;]" "action to be taken in case of noncompliance with State requirements[;]" "[a] Traffic Control Plan to provide for ease of traversability of the motorist[;]" and "[o]ther provisions as deemed necessary." These encroachment agreements are submitted to NC DOT's Raleigh office or to the NC DOT division engineer, based on the type of utility structure, for approval. The 1975 NC DOT manual states,

The Division Engineer shall investigate the request and determine the acceptability of the encroachment, based on [NC DOT] utility

accommodation policies as contained herein. Any deviations from [NC DOT] policies must be thoroughly justified and documented in the file on the particular encroachment. When the Division Engineer determines that the encroachment is acceptable, he will execute the Agreement[.]

Upon notice of completion, "[t]he Division Engineer or his designated representative shall make a final inspection of all authorized encroachments on highways open to traffic." Plaintiff included in her complaint, the affidavit of Mr. Spangler, a NC DOT district engineer, which states, in pertinent part:

3. Since the 1975 publication of the Department of Transportation's "Policies and Procedures for Accommodating Utilities on Highway Rights of Way," utility companies are required to obtain written permission of the Department of Transportation before placing a utility in the right-of-way of any road on the North Carolina State System . . . .

Therefore, a utility provider cannot place a utility pole in the right-of-way without an encroachment agreement and, since an encroachment agreement can only come from NC DOT, proper placement of utilities in public rights-of-way in accordance with the applicable regulations is within the sole discretion of NC DOT. NC DOT evaluates the description of the proposed or existing utility to be placed in the right-of-way and applies the guidelines for placement in the 1975 NC DOT manual to make the ultimate decision to approve or disapprove placement of utilities in the public right-of-way.

The 1975 NC DOT manual guidelines list various factors for NC DOT to consider when evaluating a utility company's request for placement of a utility pole in a public right-of-way in the section titled, "OVERHEAD POWER AND COMMUNICATION LINES[:]" "[t]he type of construction, vertical clearance above pavement, and location of poles, guys, and related ground-mounted utility appurtenances along the roadside[;]" "the width of the border area, that is, the space between the back of [the] ditch or curb line and the right-of-way line, and its availability and suitability for accommodating such facilities[;]" and "[t]he nature and extent of roadside development and the ruggedness of the terrain being traversed[.]" The 1975 NC DOT manual also states that "[w]here ground-mounted utilities are to occupy [the space between the back of [the] ditch or curb line and the right-of-way line], they should be placed as far as practical from the traveled way and beyond the clear recovery area."

Specifically as to location, the 1975 NC DOT manual states that "[p]oles and related facilities on and along conventional highways in rural areas shall be located at or as near as practical to the right-of-way line. The poles should be located outside the clear recovery area for the highway sections involved." The 1975 NC DOT manual defines the "clear recovery area" as

> [t]hat portion of the roadside, adjacent to the traveled way and shoulders, having slopes safely traversable by vehicles and which has been designated as the area to be kept as free as practical from those above-ground physical obstructions that would be a hazard. The width of an area varies according to the type of highway involved and may vary on different sections of the same type of highway.

Unlike the simple standards of six inches from the side of the paved roadway, as mentioned in *Shapiro*, 38 N.C. App. at 660, 248 S.E.2d at 869, there is no standard "clear recovery area" for a particular type of roadway, as the "clear recovery area" must be determined based upon the characteristics of each particular roadway. Documents included by plaintiff with her complaint demonstrate the complexity of making a determination as to the "clear recovery area." The American Association of State Highway and Transportation Officials' ("AASHTO") 1988 "Roadside Design Guide" sets forth the complex technical guidelines for calculation of a "clear recovery area," which include variables of the design speed of the roadway, the average daily traffic, the location and grade of cut slopes or fill slopes beside the roadway, embankments, and the horizontal curve of the roadway. The AASHTO's 1977 "Guide for Selecting, Locating, and Designing Traffic Barriers" ("the 1977 AASHTO Guide") sets forth a mathematical engineering formula for calculation of the "clear zone width" in a curve, noting that it "should be increased on the outside of [the] curves by the amount of the tangent offset at a distance $L_R$ into the curve. The increase should be tapered on the curve at the entrance end and on the tangent at the exit end of the curve."[6] The 1977 AASHTO Guide also notes that "[s]trict adherence to these [suggested clear zone width] criteria may be impractical in many situations due to limited right-of-way or other restricted conditions." It is apparent, even with our lack of highway engineering expertise, that calculation of a "clear recovery area" for a particular roadway depends upon the design of the particular

---

6. On page 17 of the 1977 AASHTO Guide it further clarifies that in the calculation of a "clear zone width[:]" "R = radius of curve - ft. (m.) $L_R$ = runout path length (Table III-E-1) - ft. (m.)" Table III-E-1 was not included in our record, as plaintiff's exhibit included only pages 16, 17 and 60 of the Guide.

MOSTELLER v. DUKE ENERGY CORP.

[207 N.C. App. 1 (2010)]

roadway, the roadway's curvature, the amount of space available in the right-of-way, the topography of the area, the average daily traffic, other utility structures, signage, or other legally permitted structures located in the right-of-way. As NC DOT issues encroachment agreements for utilities wishing to place a pole in the right-of-way, NC DOT is charged with the duty and responsibility of applying these standards for a "clear recovery area" to each roadway. As the 1977 AASHTO Guide notes, in some instances compliance with the "suggested clear zone width" criteria may not be practical, but NC DOT has to consider each application individually to make the determination.

Here, plaintiff alleges that defendant Duke Energy was negligent in its failure to install and/or replace the subject utility pole "in a location consistent with [NC DOT] regulations[.]" However, the NC DOT guidelines themselves do not permit a determination by plaintiff as to whether the placement was proper; as the guideline factors and required calculations for determinating the "clear recovery area" demonstrate, the application of the guidelines is complex and requires the expertise of the NC DOT. NC DOT has the legal authority and discretion to evaluate each application and to determine the proper location of a particular utility pole in accordance with the regulations and guidelines. Plaintiff makes no allegation that the placement of the subject utility pole *was determined by NC DOT* to be in violation of NC DOT regulations and guidelines. This is the break in the plaintiff's chain of proximate cause under *Baldwin*. Plaintiff did not allege that NC DOT has ever evaluated the location of the subject utility pole and determined that its location was in violation of the applicable regulations and guidelines.

Certainly, as plaintiff has alleged, she was injured because the utility pole was in the path of the car in which she was riding when it left the roadway, but the complaint fails to allege that NC DOT would not have approved the subject utility pole's location. We therefore have no way of knowing if it would have made any difference whatsoever to plaintiff if defendant Duke Energy had obtained a permit or encroachment agreement for the subject utility pole. It is entirely possible that NC DOT would have actually approved the location of the subject utility pole if defendant Duke Energy had properly made application for written permission. The affidavits from various NC DOT officials set forth the applicable regulations and aver only that defendant Duke Energy did not obtain written permission from NC DOT, and we accept all of these statements as true for purposes of the motion to dismiss; but the affidavits do not say that NC DOT would

have denied a permit if one had been requested. For plaintiff to have properly pled defendant Duke Energy's location or maintenance of the subject utility pole as a proximate cause of her injuries, she must have alleged that if the pole had been in its proper location, *as determined by NC DOT*, she would have avoided injury from collision with the pole when defendant Walker ran off of the road.[7]

Plaintiff also argues that the "trial court err[ed] by failing to recognize that the Legislature has superseded <u>Wood v. Carolina Telephone & Telegraph</u> (228 N.C. 605, 46 S.E.2d 717 (1948)) as controlling legal authority through its grant of power to the N.C. Department of Transportation pursuant to N.C.G.S. § 136-18(10) to regulate the installation and maintenance of utility poles alongside roadways . . . ." Plaintiff contends that *Wood,* decided in 1948, is no longer controlling because the NC DOT regulations, which we have determined to be applicable safety regulations, establish defendant Duke Energy's duty and standard of care. To the extent that plaintiff argues that the Legislature has granted "power to the N.C. Department of Transportation pursuant to N.C. Gen. Stat. § 136-18(10) to regulate the installation and maintenance of utility poles alongside roadways[,]" we agree with plaintiff. As discussed above, the legislature did grant that power to NC DOT, and only to NC DOT. But we reject plaintiff's argument that this grant of regulatory power to NC DOT superseded *Wood* for two reasons. First, the Supreme Court recognized in *Wood* that the pole may have been located in violation of a town ordinance, but did not deem it necessary to address this issue. 228 N.C. at 607, 46 S.E.2d at 718-19. In addition, there were allegations that various placement regulations in *Shapiro,* 38 N.C. App. at 660-61, 248 S.E.2d at 869-70 were violated, but again these regulations did not overcome *Wood's* precedent. Secondly, in *Baldwin,* 335 N.C. at 548, 439 S.E.2d at 110, our Supreme Court recognized some of the same regulations as

---

7. Plaintiff also alleged that federal regulations require "utilities to obtain an exemption from the applicable State Department of Transportation for placement of above-ground utility installations within the 'established clear zone' on a Federal-aid or direct Federal highway project. *See* 23 C.F.R. 645.209, . . . 23 C.F.R. 645.207, . . . 23 C.F.R. 645.211, . . . ." These regulations require that for Federal-aid or direct Federal highway projects, the State transportation departments must adhere to a "clear roadside policy" that provides for a "clear zone" along the edge of the roadway. We note that application of these Federal regulations to this case could also result in plaintiff having to allege that placement of the subject utility pole was in violation of Federal regulatory requirements as determined by the applicable authority, state or federal. However, plaintiff conceded in her brief that "[Belmont Mount Holly Road] is not a Federal-aid or direct Federal highway project" and did not address the issues of proximate causation and the application of federal regulations to the subject utility pole, so we will not address this issue.

pled here as safety regulations, the violation of which constituted negligence *per se*, but did not state that these regulations had any effect upon the validity of *Wood* or any of the other precedents following *Wood*, although these issues were argued before the Supreme Court in *Baldwin*. Under these circumstances, we believe that any holding that the NC DOT regulations adopted pursuant to N.C. Gen. Stat. § 136-18(10) supersede *Wood* must come from our Supreme Court, as we are bound by *Wood*, *Shapiro*, *Alston*, and *Baldwin*.

Our holding that plaintiff must allege that the proper location for the subject utility pole as determined by NC DOT in order to properly plead proximate causation is consistent with the Legislature's grant of regulatory power to the NC DOT as well as the holdings of *Wood*, *Shapiro*, *Alston*, and *Baldwin*. It is also in accord with the public policy concerns which are unavoidable in this type of case. As noted by our Supreme Court in *Sutton*, defining proximate cause in this context must include "considerations of logic, common sense, justice, policy and precedent. . . ." 277 N.C. at 108, 176 S.E.2d at 169.

Defendant Duke Energy argues that *Bender v. Duke Power Co.*, 66 N.C. App. 239, 311 S.E.2d 609 (1984) is instructive as to these public policy concerns. The plaintiff in *Bender* was injured when overhead electrical wires fell across the highway in front of his vehicle during a thunderstorm. *Id.* at 239, 311 S.E.2d at 609. The plaintiff claimed that defendant Duke Power was negligent in the placement and maintenance of the overhead power lines because first, "defendant placed its poles too close to highway I-85 for safety of highway users, and second, that because of defendant's knowledge that its wires at this I-85 crossing had been previously knocked down by lightning, the overhead wires should have been removed and placed under the highway." *Id.* at 242, 311 S.E.2d at 611. The *Bender* Court rejected the first theory, that the poles were too close to the highway, stating that

> proximity of defendant's poles to I-85 would have no causal relationship to the falling down of wires supported by such poles when the poles or the wires are broken by lightning, and therefore the proximity of the poles to the highway, as a matter of law, could not have been a proximate cause of plaintiff's injury.

*Id.* The Court responded to the plaintiff's second theory, that the lines should have been placed underground because the lines had previously been knocked down by lightning, on principles of foreseeability. *Id.* The Court noted that as in every negligence case,

the threshold questions are duty and proximate cause. At the threshold of duty is foreseeability. If under the circumstances of this case, defendant could have reasonably foreseen that placing its wires over I-85 might result in harm to others, it would be answerable for plaintiff's injury. Plaintiff contends that because lightning had struck these same wires previously and caused them to fall across the highway, defendant could have reasonably foreseen that it would happen again. We cannot agree. While it is clear that defendant could reasonably foresee that lightning could strike its pole lines from time to time, no one can reasonably foresee when or where lightning may strike any particular object. To agree with plaintiff would open a very expensive door. We can take judicial notice that electric lines suspended from poles may be damaged by at least four natural phenomenon over which electric utilities have no control: lightning, wind, ice, and snow. The only way to insure that overhead electric lines crossing public streets or highways might not fall down due to the forces of such natural phenomenon would be to place all such lines underground. The cost of such an undertaking would be so large and hence carry with it such considerations of public policy that it would be entirely inappropriate to establish judicially a precedent for such a requirement.

*Id.* at 242, 311 S.E.2d at 611-12.

Defendant Duke Energy argues that "[t]he same public policy issues and concerns apply just as much in this case as they did in *Bender*" and that this Court should "refrain from creating such a significant **judicial precedent** which would effectively impose a completely impractical and prohibitively costly requirement upon Duke Energy and all of the electrical providers in this State." (Emphasis in original). We agree that this Court should not "establish judicially a precedent" which would effectively require all utility providers or others who have need to place structures within rights-of-way of roadways in North Carolina to place them in such a manner that it would be practically impossible for an "errant vehicle" to hit them. Our legislature and NC DOT have already considered these issues and have adopted statutes and regulations which balance the need to have certain structures within roadway rights-of-way against the safety of those who use the roadways, in addition to consideration of the costs of various alternatives. NC DOT has the duty and responsibility to consider all of the relevant factors at each location and to establish where utility structures should be located. This balance is not perfect, as

it was devised by and is implemented by human beings, and in some truly tragic cases, the result may be grievous injury, as in plaintiff's instance, or even death. However, without the allegation of a determination by NC DOT that the subject pole was in a location which would not have been approved by NC DOT, plaintiff's complaint has not adequately pled proximate cause of her injuries by defendant's negligence *per se. See Hart v. Ivey*, 332 N.C. at 303, 420 S.E.2d at 177-78.

C. Negligence

[3] Plaintiff also makes allegations of ordinary negligence against defendant Duke Energy. In addition to its allegations that defendant Duke Energy failed to obtain a permit or encroachment agreement for the subject utility pole, plaintiff has alleged that defendant Duke Energy should have known that the location was dangerous, independently of any evaluation by NC DOT. As to the placement of the subject utility pole, plaintiff alleges that defendant Duke Energy (1) "regularly and routinely install[s] and/or directs the installation of utility poles as a part of its business[;]" (2) "rel[ies] upon known principles of physics, research and experience in the selection and placement of locations for utility poles[;]" (3) "hire[s], retain and employ engineers and others with specific expertise in the field of utility pole placement[;]" (4) "[is] aware that improper utility pole placement increases the likelihood of vehicle impact and vehicle occupant injury[;]" and (5) "among the scientific principles known to [defendant Duke Energy] and utilized in the selection of utility pole placement are the following:

a. Because of centrifugal forces it is more likely for a vehicle to run off of a roadway on the outside of a curve than on the inside of a curve;

b. Vehicle departure from the right side of the roadway in a curve arced to the left is the most common manner by which vehicles errantly leave the roadway in a curve;

c. As applied to roadways, as the degree of the curvature increases, so does the likelihood of a vehicle leaving the roadway on the outside of the curve;

d. Increases in the design speed of a roadway correlate with increases in the likelihood of a vehicle leaving the roadway on the outside of a curve in such a roadway; and,

e. Increases in the speed of vehicles on a roadway correlate with an increase in the likelihood of a vehicle leaving the roadway on the outside of a curve in such roadway.

Based on these allegations, plaintiff alleges that defendant Duke Energy was negligent in failing to (1) perform an analysis of safety to the traveling public prior to placement of the subject utility pole; (2) "investigate, appreciate, and implement appropriate engineering response[s]" to the prior collisions with the subject utility pole; (3) to reduce risks after being on notice of prior impacts to the subject utility pole; (4) locate the subject utility pole "in a location consistent with accepted industry practice;" (5) reduce the risk to the traveling public by taking additional safety measures; (6) "exercise and apply reasonable engineering judgment" in the installation and maintenance of the subject utility pole; and (7) to warn the traveling public of the known danger of operating a vehicle in the location near the subject utility pole. Although these allegations of negligence are not specifically or solely based on violations of NC DOT guidelines or regulations, they are based to a certain extent on the same guidelines or regulations as discussed above, as the determination of a "location consistent with accepted industry practice" would necessarily require compliance with NC DOT guidelines and regulations, or NC DOT would not approve the location. However, even if we consider *arguendo* plaintiff's allegations of negligence as separate from those related to the applicable safety regulations and guidelines, the rule as stated in *Wood* and followed by *Shapiro* is still applicable to plaintiff's allegations of ordinary negligence. *Baldwin* did nothing to change this result as to allegations of ordinary negligence. As stated above, the *Wood* Court held that, "even if we concede negligence on the part of the defendant as alleged by plaintiff, there is no allegation in the complaint which reasonably imports injury to plaintiff as a proximate result thereof[,]" because plaintiff's negligence in leaving the roadway "was the intervening proximate cause of [plaintiff's] injury." 228 N.C. at 607-08, 46 S.E.2d at 719. This rule was adopted by the *Shapiro* Court which held that "the maintenance of a utility pole along a public highway does not constitute an act of negligence unless the pole constitutes a hazard to motorists using the portion of the highway designated and intended for vehicular travel in a *proper manner.*" 38 N.C. App. at 663, 248 S.E.2d at 871. Accordingly, defendant Walker's negligence in leaving the paved roadway was the intervening proximate cause of plaintiff's injuries, and we hold that the trial court properly dismissed plaintiff's claims for ordinary negligence.

## IV. Conclusion

The allegations of plaintiff's complaint, treated as true, fail to state a claim that defendant Duke Energy's negligence *per se* or

**IN RE P.O.**

[207 N.C. App. 35 (2010)]

ordinary negligence was a proximate cause of plaintiff's injuries. Dismissal of plaintiff's complaint was therefore proper and the trial court's order is affirmed.

AFFIRMED.

Judges GEER and ERVIN concur.